THE PEOPLE'S LAW FIRM, PLC
Stephen D. Benedetto (Ariz. Bar No. 022349)
645 North 4th Avenue, Suite A
Phoenix, Arizona 85003
Telephone: (602) 456-1901
Facsimile: (602) 801-2834
benedetto@the-plf.com

*Firm email for docketing purposes:*
admin@the-plf.com

*Attorneys for Plaintiff Michael Kenyon*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Kenyon,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>City of Phoenix, an Arizona municipal corporation; Officer Rowan Clarke, in his individual capacity; Officer Ira Salinas-Jerry, in his individual capacity; Officer Adelbert Caraig, in his individual capacity; Officer Eric Jusseume, in his individual capacity,<br><br>　　　　　　　Defendants. | Case No.<br><br>**COMPLAINT** |

For her Complaint against Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume, Plaintiff Michael Kenyon, through undersigned counsel, hereby alleges as follows:

**PARTIES**

1. Plaintiff Michael Kenyon is a resident of Phoenix, Arizona.

2. Defendant Rowan Clarke is a police officer with the City of Phoenix Police Department. Upon information and belief, he resides in Maricopa County, Arizona. At all times relevant to the complaint, Defendant Clarke was acting under the color of law, in furtherance of the interests of the City of Phoenix, and within the course and scope of his

employment. He is being sued in his individual capacity under 42 U.S.C. § 1983.

3. Defendant Ira Salinas-Jerry is a police officer with the City of Phoenix Police Department. Upon information and belief, he resides in Maricopa County, Arizona. At all times relevant to the complaint, Defendant Salinas-Jerry was acting under the color of law, in furtherance of the interests of the City of Phoenix, and within the course and scope of his employment. He is being sued in his individual capacity under 42 U.S.C. § 1983.

4. Defendant Adelbert Caraig is a police officer with the City of Phoenix Police Department. Upon information and belief, he resides in Maricopa County, Arizona. At all times relevant to the complaint, Defendant Caraig was acting under the color of law, in furtherance of the interests of the City of Phoenix, and within the course and scope of his employment. He is being sued in his individual capacity under 42 U.S.C. § 1983.

5. Defendant Eric Jusseume is a police officer with the City of Phoenix Police Department. Upon information and belief, he resides in Maricopa County, Arizona. At all times relevant to the complaint, Defendant Jusseume was acting under the color of law, in furtherance of the interests of the City of Phoenix, and within the course and scope of his employment. He is being sued in his individual capacity under 42 U.S.C. § 1983.

6. Upon information and belief, there are currently unknown City of Phoenix employees and other personnel who caused or contributed to Plaintiff's injuries. The identity and roles of these individuals are uniquely within the possession of the City of Phoenix and Plaintiff will amend her complaint to add such responsible individuals upon discovery of their identities.

7. Defendant City of Phoenix (the "City") is a municipal corporation created under the laws of the State of Arizona. The City maintains and operates a law enforcement agency known as the City of Phoenix Police Department.

8. The City is under a duty to run its law enforcement activities in a lawful manner to preserve the peace and to preserve for its citizens the rights, privileges, and

immunities guaranteed and secured to them by the Constitutions and laws of the United States and the State of Arizona.

9. The City has established or delegated to its law enforcement agency the responsibility for establishing and implementing policies, practices, procedures and/or customs used by law enforcement officers employed by the City regarding the investigation, detention, arrest, and public relations during law enforcement operations.

10. Every act and omission of the employees, representatives, and agents of the Defendants detailed in this Complaint was performed under the color and pretense of the Constitutions, statutes, ordinances, regulations, customs, and uses of the United States of America, the State of Arizona, and the City of Phoenix, by their authority as sworn officers, and within the course and scope of their employment.

11. For Plaintiff's state law claims, but not for her claims under section 1983, the City is responsible for the wrongful acts or omissions of its employees under the doctrine of *respondeat superior*.

## JURISDICTION, AND VENUE

12. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343(a)(3)(4) and 1367(a). This Court has jurisdiction over Plaintiff's claims for violation of his civil rights under 42 U.S.C. § 1983 and pendent jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367(a).

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that the acts and omissions that give rise to this action occurred within this District within one year of the filing of the original Complaint, and this Court otherwise has jurisdiction.

14. This case presents an actual case in controversy arising under the Fourth, and Fourteenth Amendments to the United States Constitution, and under the provisions of 42 U.S.C. §§ 1983 and 1988.

## **GENERAL ALLEGATIONS**

15.  Shortly before 2 p.m. on July 6, 2024, one of Michael Kenyon's roommates the downtown Phoenix home in which he lived (the "Home") called Phoenix Police to report a suspected non-violent theft. Michael's roommate described the suspect to Phoenix Police dispatch (summarized by one of the officers involved as follows):

```
PHOENIX DISPATCH AND OFFICER JUSSEAUME RADIO COMMUNICATION:
1357 HOURS - DISPATCH: WHITE MALE, 5'5", TATS ON BACK, BLONDE HAIR AND BLUE EYES
1358 HOURS - DISPATCH: SAID HE FORCED ENTRY INTO HOME
1359 HOURS - DISPATCH: CAME THERE TO STEAL STUFF THINKS POSSIBLY GOING TO LEAVE SOON
1359 HOURS - OFFICER JUSSEAUME: JUST TO BE CLEAR STILL FORCED ENTRY
1401 HOURS - DISPATCH: STILL FORCED ENTRY AND TAKING LAPTOP
1401 HOURS - DISPATCH: ABOUT TO LEAVE
1402 HOURS - DISPATCH: SUBJECT POSSIBLY CARRYING PEPPER SPRAY
1402 HOURS - OFFICER JUSSEAUME: 23 (ARRIVED ON THE CALL)
```

16.  When all of this was unfolding Michael was at the Home. He had spoken to roommate whose laptop had been taken and was aware of the crime.

17.  Not expecting police to respond so quickly to take a report about a non-violent property crime, Michael left the home to walk to the Circle K around the corner to buy a drink.

18.  As Michael walked across a public parking lot towards the convenience store he spoke on the phone. Holding the phone in one hand, and a visible keychain in the other, it was obvious that he was not carrying a laptop or pepper spray.

19.  Wearing a tank top shirt, it was apparent he did not have tattoos. And, standing 5'10" tall, he could not reasonably be mistaken for someone 5'5".

20.  When Phoenix Police officers Adelbert Caraig and Eric Jusseaume pulled up behind him in their Phoenix PD Tahoe, however, they called to Michael and instructed him to come back.

21.  Michael readily turned around in response to the officer's requests and willingly walked back to them. He began to answer their first question to them.

22. Within seconds of their initial contact with Michael, however, the officers grabbed both of his arms—despite the fact that Michael clearly did not fit the description of the person they were supposed to be looking for.

23. Scared by the officers' aggressiveness, Michael sat on the bumper of a truck to show the officers he had no intention to flee and that they did not need to grab him and asked for clarification of what was happening.

24. The officers responded by telling Michael that he was being detained.

25. Less than 45 seconds on the bumper in hopes of demonstrating his compliance the officers put Michael on the ground.

26. By this point two more—Officers Clarke and Salinas-Jerry—arrived. All four officers piled on top of Michael, pressing him against the scalding hot pavement.

27. As Michael screamed out for help, the officers pressed hard—one officer at one point kneeling on his head, and pressing the side of his face into the asphalt as other officers put their weight on his torso.

28. By the time the officers pulled Michael off the pavement four minutes had passed. He had third-degree, full thickness burns on his arms, legs, chest, and face. He was in so much pain he could not even stand, and had to be assisted into a police car.

29. Eventually, Mr. Kenyon was able to walk to the police Tahoe, and sit in the back seat. He waited there, handcuffed, in excruciating pain, and begging for help, until Phoenix Fire arrived and transported him to the Maricopa County Burn Center at Valleywise.

30. Upon information and belief, Phoenix Fire administered Michael 200mg of Ketamine before he was brought to the hospital; as a result, when Michael arrived at the Burn Center's emergency room he was "altered on arrival and unable to provide further history."

31. Upon information and belief, Phoenix Police Officers followed Phoenix Fire to the hospital—and, with Michael incoherent, officers advised hospital staff (either directly or through Phoenix Fire) that Michael was "acting altered prior to" their contact with him.

32. By the time Michael was admitted at the hospital, Pheonix PD officers knew Michael's name, date of birth, and other identifying information. They also knew (as they did before they contacted him) that he was much taller than 5'5, he did not have tattoos on his back, and he was not carrying a stolen laptop or pepper spray.

33. Despite being able to confirm that Michael was *not* the suspect they were looking for, officers caused Michael's phone to be taken from him, preventing him from calling his family, friends, or employer to let them know where he was or what happened.

34. Then, incredibly and inexplicably—given that, again, officers were able to confirm that he was *not* the suspect for the non-violent theft offense they were investigating—Phoenix PD officers handcuffed to the hospital bed:



35. Michael would ultimately spend more than 30 days in the Maricopa County Burn Center—during which he would go through a series of brutally painful procedures, including skin grafts, to attempt to treat his injuries. He has since spent time in physical therapy attempting to regain mobility of his arms despite these burns. And he continues to carry the severe scarring and disfigurement of what these officers did to him.





**Phoenix PD's Deficient Training, Unconstitutional Practices,
and Violent Culture Caused Michael's Injuries**

<u>Phoenix Police Caused 2nd Degree Burns to a 17-year-old high school student.</u>

36.  On August 20, 2019, Phoenix was in the midst of an historic heat wave. That day, the mid-day temperature soared to 113 degrees, breaking a 33-year-old record.[1]

37.  In light of the record heat, the National Weather Service issued an excessive heat warning that day, cautioning individuals in Phoenix to avoid outdoor activities—and identifying most of the City as facing a level of heat that was "rare, dangerous, and deadly."[2]

38.  After completing her school day at South Pointe High School, a teenager named Roniah Trotter got into a verbal—and then physical altercation—with a classmate at South Phoenix bus stop.

39.  Like most adolescent fights, the altercation was short and mostly harmless: The girls quickly tired themselves out in the 113-degree heat and the fight ended without anyone being seriously physically injured.

40.  When it was over, the girls' peers milled around the bus stop, waiting in the heat for the next bus to arrive so they could board it and continue their trip home.

41.  When Phoenix Police officers arrived, the two girls were already separated and remained so as police completed witness interviews.

42.  After concluding the interviews, an officer grabbed Roniah her from behind. Roniah, who is approximately 5 feet, 4 inches tall and weighs about and 130 pounds, was confused and agitated by the unexpected physical force and instinctually recoiled when the officer grabbed her.

---

[1] *See* https://www.azcentral.com/story/news/local/phoenix-weather/2019/08/20/phoenix-forecast-city-could-break-heat-record-august-record-high-temperature/2032798001/
[2] *Id.*

43. The officers then put Roniah onto the concrete, pinned her face-down, and held her there.

44. As a result of the officers' conduct, Roniah suffered second-degree burns to her arms and filed a lawsuit against the City of Phoenix.

45. That the officers grabbed Roniah, put her on the ground, and held her there until she suffered second-degree burns was never in dispute in that lawsuit—in which the City of Phoenix as named and served.

<u>Phoenix Police killed a man by holding him on the hot pavement</u>

46. On August 4, 2020, the high temperature was 109 degrees.

47. That morning, at approximately 10:30 a.m., Phoenix Police chased and tackled 28-year-old Ramon Lopez after he stole a drink from a convenience store.

48. The officers pressed Mr. Lopez against the concrete for nearly six minutes before he stopped moving, and they carried his motionless body to a police car.

49. Mr. Lopez later died in custody.

<u>Phoenix City Council's Actions to Protect Dogs from Hot Hiking Trails</u>

50. Upon information and belief, Roniah Trotter and Ramon Lopez are not the only two people to be pressed against hot concrete by Phoenix Police officers and seriously injured.

51. Years before their injuries, in 2016, the Phoenix City Council implemented a ban prohibiting pet owners from taking their dogs on a walk on any City hiking trail when temperatures reach over 100 degrees Fahrenheit.

52. Enacted to prevent burns to dog's feet caused by the notoriously high temperature of the ground in the Phoenix summers, the City's regulation made it a class one misdemeanor, punishable by a $2,500 fine and six months in jail, for people to bring their dogs for hikes on days where the temperature exceeds 100 degrees.

53. For years, the City's official website maintained a specific page dedicated to

*Pet Safety* warning pet owners that "[s]ummertime heat poses a significant threat the family dog.  When walking or playing on hot asphalt during summer months, the dog's feet may become burned."  Upon information and belief this page was deactivated after the injuries to Ms. Trotter and death of Mr. Lopez.

54. Upon information and belief, despite being on actual notice of Roniah Trotter's case and the serious injuries that could be caused to dogs walking on hiking trails, neither the Phoenix City Council nor any other policymaker at the City of Phoenix made a specific effort to create a policy pressing holding human beings on concrete or asphalt on exceptionally hot days.

55. Upon information and belief, despite being on actual notice of Roniah Trotter's case and the serious injuries that could be caused to dogs walking on hiking trails, neither the Phoenix City Council nor any other policymaker at the City of Phoenix made a specific effort to create a policy regarding pressing human beings against concrete or asphalt on exceptionally hot days.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983—Excessive Force in Violation of the Fourth Amendment**
**(Against Individual Officer Defendants)**

56. Plaintiff incorporates by reference all allegations asserted in the paragraphs above as though they were fully set forth herein.

57. 42 U.S.C. § 1983 provides, in relevant part, as follows:

> Every person, who under the color of any statute, ordinance, regulation, custom or usage of any state or territory of the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress. . .

58. Michael Kenyon is a citizen of the United States, and Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume are "person[s]" for the purposes of 42 U.S.C. § 1983.

59.     Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume were, at all times relevant hereto, acting under the color of law, in their capacities as a City of Phoenix police officers.

60.     At the time of the above-mentioned, complained-of events, the Fourth Amendment to the United States Constitution clearly established Michael Kenyon's right to be secure in his person from unreasonable seizure through excessive force.

61.     Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume violated these rights when they held Michael down on hot concrete that caused him to sustain third-degree burns on large portions of his body.

62.     Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume engaged in the above-described conduct willfully, maliciously, in bad faith, and in reckless disregard of Michael's federally protected constitutional rights.

63.     The acts and omissions of Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume as described herein intentionally deprived Michael of his constitutional and statutory rights and caused him other damages.

64.     Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume are not entitled to qualified immunity for the complained-of unconstitutional and illegal conduct because Michael's had a clearly established constitutional right to be free from excessive force, and any reasonable officer in the defendants' position would know that, at 2 p.m. on a 113-degree day, the parking lot asphalt would be extremely hot and pressing a human being against it for over four minutes would likely cause serious bodily injury or death.

65.     As a proximate result of Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume Bryce's unlawful conduct, Michael suffered severe permanent injuries, pain and suffering, and other damages and losses as described herein, entitling imr to damages in amounts to be determined at trial.

66. Michael is further entitled to attorneys' fees and costs under 42 U.S.C. § 1988, pre-judgment interest and costs allowable by federal law.

67. In addition to compensatory, economic, consequential, and special damages, Michael is entitled to punitive damages against Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume under 42 U.S.C. § 1983, in that the actions of these Defendants were taken maliciously, willfully, or with reckless or wanton disregard of his constitutional rights.

**SECOND CLAIM FOR RELIEF**
**Municipal Liability Under *Monell***
**(Against the City of Phoenix Only)**

68. Plaintiff incorporates by reference all allegations asserted in the paragraphs above as though they were fully set forth herein.

69. Municipal bodies are liable for constitutional violations under 42 U.S.C. § 1983 when execution of its official policy or custom deprives an individual of its rights protected by the Constitution.

70. Such municipal liability exists when a city fails to properly train, supervise, or discipline its employees, or otherwise maintains a policy or custom that results in constitutional violations, thereby amounting to a deliberate indifference to a plaintiff's constitutional rights.

71. At all times relevant hereto, Defendant City of Phoenix had a duty to properly train, supervise, and discipline their employees and agents.

72. At all times relevant hereto, Defendant City of Phoenix had a duty to enact reasonable and appropriate written policies to guide the reasonable and constitutional use of force.

73. Defendant City of Phoenix breached these duties by, among other things, failing to maintain a policy prohibiting officers from pressing a suspect against hot surfaces capable of causing partial thickness burns.

74. This is a policy, pattern, practice, or custom of the Phoenix Police Department, as evidenced by the fact that multiple officers of the City of Phoenix Department failed to initiate a policy prohibiting this excessive force or provide training for alternative arrests methods to avoid placing a human being on the pavement for extended periods of time, and it has, upon information and belief, resulted in numerous other injuries and deaths including Roniah Trotter and Ramon Lopez.

75. This policy, pattern, practice, or custom is tacitly or overtly sanctioned, as evidenced by the conduct of the defendants, and the City of Phoenix's failure to train, supervise, investigate, and discipline any of the defendants involved in this incident, which amounted to a deliberate indifference to Plaintiff's constitutional rights.

76. This unconstitutional behavior was carried out pursuant to a policy, pattern or practice, or custom, whether formal or informal, which violates the constitutional rights of the Plaintiff and others in Plaintiff's situation.

77. The condoning of the misconduct, and failure to end these policies, patterns, practices, or customs, was a direct and proximate cause of injuries suffered by Plaintiff.

**THIRD CLAIM FOR RELIEF**
**Assault and Battery—Vicarious Liability**
**(Against the City of Phoenix Only)**

78. Plaintiff hereby incorporates all allegations contained in the foregoing paragraphs as if they were full set forth herein.

79. As set forth herein, Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume and/or offensive contact with Michael by, among other things, putting him on the ground and pressing him against dangerously hot asphalt until he sustained third-degree burns over large portions of his body.

80. As a direct and proximate cause of these officers' harmful and offensive contact, Michael was injured and suffered damages in an amount to be proven at trial.

81. As set forth herein, these officers were acting within the course and scope of their employment with the City of Phoenix: they were City of Phoenix employees, performing acts they were authorized to perform; they were on-duty, working in their regular job capacities as police officers; and their actions were motivated, at least in part, by a purpose to serve the City of Phoenix.

82. Because these Officers were acting within the course and scope of their employment for the City of Phoenix, Defendant City of Phoenix is vicariously liable for the damages caused by these employees' tortious conduct.

**FOURTH CLAIM FOR RELIEF**
**Intentional Infliction of Emotional Distress – Vicarious Liability**
**(Against Defendant City of Phoenix only)**

83. Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if they were fully set forth herein.

84. The above-described actions of Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume – pressing Michael against hot concrete until the skin melted from his body and he believed he was going to die – were extreme and outrageous.

85. An average member of the community would regard the conduct referenced in the foregoing paragraph as atrocious, intolerable in a civilized community, and beyond all possible bounds of human decency.

86. The above-described conduct of these officers was intentional insofar as they intended to cause Michael emotional distress.

87. The above-described conduct of these Officers was reckless because they were aware of and consciously disregarded the near certainty that it would cause Michael emotional distress.

88. The above-described conduct of these Officers caused Michael to suffer severe emotional distress, requiring hospitalization.

89. As a direct and proximate result of the actions of these Officers, Michael was injured and suffered damages in an amount to be proven at trial.

90. As set forth herein, these Officers were acting within the course and scope of their employment with the City of Phoenix: they were City of Phoenix employees, performing acts they were authorized to perform; they were on-duty, working in their regular job capacities as police officers; and their actions were motivated, at least in part, by a purpose to serve the City of Phoenix.

91. Because these Officers were acting within the course and scope of their employment for the City of Phoenix, Defendant City of Phoenix is vicariously liable for the damages caused by these employees' tortious conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Michael Kenyon hereby requests that the Court enter judgment against Defendants and issue an award in Plaintiff's favor as follows:

a. For damages in an amount to compensate Mr. Kenyon fairly and fully for the numerous violations of his Constitutional Rights;

b. For general, consequential, special, and compensatory damages, including but not limited to Mr. Kenyon's past and future medical expenses, past and future lost wages and lost earning capacity, pain and suffering, mental anguish, emotional suffering, permanent scarring and disfigurement, and loss of enjoyment of life, arising both out the violations of both his constitutional rights and the officers' tortious conduct;

c. For nominal damages as provided for by law;

d. For punitive damages as provided for by law;

e. For prejudgment interest on all liquidated sums;

f. For attorneys' fees under 42 U.S.C. §§ 1983 and 1988, and as provided for by Arizona law;

    g. For Mr. Kenyon's costs and other expenses incurred in this action; and

    h. Such other and further relief as the Court deems just.

DATED this 3rd day of July, 2025.

                        THE PEOPLE'S LAW FIRM, PLC
                        645 North 4th Avenue, Suite A
                        Phoenix, AZ  85003


                        By: /s/ Stephen D. Benedetto
                            Stephen Benedetto

                        *Attorneys for Plaintiff Michael Kenyon*