THE PEOPLE'S LAW FIRM, PLC
Stephen D. Benedetto (Ariz. Bar No. 022349)
645 North 4th Avenue, Suite A
Phoenix, Arizona 85003
Telephone: (602) 456-1901
Facsimile: (602) 801-2834
benedetto@the-plf.com

*Firm email for docketing purposes:*
admin@the-plf.com

*Attorneys for Plaintiff Michael Kenyon*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Kenyon,<br><br>            Plaintiff,<br><br>v.<br><br>City of Phoenix, an Arizona municipal corporation; Officer Rowan Clarke, in his individual capacity; Officer Ira Salinas-Jerry, in his individual capacity; Officer Adelbert Caraig, in his individual capacity; Officer Eric Jusseume, in his individual capacity,<br><br>            Defendants. | Case No. 2:2025-cv-02345<br><br>**AMENDED COMPLAINT**<br><br>**JURY DEMAND** |

For his Complaint against Defendants City of Phoenix, Clarke, Salinas-Jerry, Caraig, and Jusseume, Plaintiff Michael Kenyon, through undersigned counsel, hereby alleges as follows:

## PARTIES

1.     Plaintiff Michael Kenyon is a resident of Phoenix, Arizona.

2.     Defendant Rowan Clarke is a police officer with the City of Phoenix Police Department. Upon information and belief, he resides in Maricopa County, Arizona. At all

times relevant to the complaint, Defendant Clarke was acting under the color of law, in furtherance of the interests of the City of Phoenix, and within the course and scope of his employment. He is being sued in his individual capacity under 42 U.S.C. § 1983.

3.    Defendant Ira Salinas-Jerry is a police officer with the City of Phoenix Police Department.  Upon information and belief, he resides in Maricopa County, Arizona.  At all times relevant to the complaint, Defendant Salinas-Jerry was acting under the color of law, in furtherance of the interests of the City of Phoenix, and within the course and scope of his employment.  He is being sued in his individual capacity under 42 U.S.C. § 1983.

4.    Defendant Adelbert Caraig is a police officer with the City of Phoenix Police Department.  Upon information and belief, he resides in Maricopa County, Arizona.  At all times relevant to the complaint, Defendant Caraig was acting under the color of law, in furtherance of the interests of the City of Phoenix, and within the course and scope of his employment.  He is being sued in his individual capacity under 42 U.S.C. § 1983.

5.    Defendant Eric Jusseume is a police officer with the City of Phoenix Police Department.  Upon information and belief, he resides in Maricopa County, Arizona.  At all times relevant to the complaint, Defendant Jusseume was acting under the color of law, in furtherance of the interests of the City of Phoenix, and within the course and scope of his employment.  He is being sued in his individual capacity under 42 U.S.C. § 1983.

6.    Upon information and belief, there are currently unknown City of Phoenix employees and other personnel who caused or contributed to Plaintiff's injuries.  The identity and roles of these individuals are uniquely within the possession of the City of Phoenix and Plaintiff will amend her complaint to add such responsible individuals upon discovery of their identities.

7.    Defendant City of Phoenix (the "City") is a municipal corporation created under the laws of the State of Arizona.  The City maintains and operates a law enforcement agency known as the City of Phoenix Police Department.

8.    The City is under a duty to run its law enforcement activities in a lawful manner to preserve the peace and to preserve for its citizens the rights, privileges, and immunities guaranteed and secured to them by the Constitutions and laws of the United States and the State of Arizona.

9.    The City has established or delegated to its law enforcement agency the responsibility for establishing and implementing policies, practices, procedures and/or customs used by law enforcement officers employed by the City regarding the investigation, detention, arrest, and public relations during law enforcement operations.

10.    Every act and omission of the employees, representatives, and agents of the Defendants detailed in this Complaint was performed under the color and pretense of the Constitutions, statutes, ordinances, regulations, customs, and uses of the United States of America, the State of Arizona, and the City of Phoenix, by their authority as sworn officers, and within the course and scope of their employment.

11.    For Plaintiff's state law claims, but not for her claims under section 1983, the City is responsible for the wrongful acts or omissions of its employees under the doctrine of *respondeat superior*.

## JURISDICTION, AND VENUE

12.    Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343(a)(3)(4) and 1367(a). This Court has jurisdiction over Plaintiff's claims for violation of his civil rights under 42 U.S.C. § 1983 and pendent jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367(a).

13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that the acts and omissions that give rise to this action occurred within this District within one year of the filing of the original Complaint, and this Court otherwise has jurisdiction.

14.    This case presents an actual case in controversy arising under the Fourth, and Fourteenth Amendments to the United States Constitution, and under the provisions of 42

U.S.C. §§ 1983 and 1988.

**GENERAL ALLEGATIONS**

15.    During the week of July 6, 2024, the City of Phoenix set record highs for temperatures, with temperatures reaching 118 degrees Fahrenheit, causing the National Weather Service to issue an Excessive Heat Watch from July 4 through July 9, 2024.[1] On July 6, 2024, temperatures in the City of Phoenix reached 115 degrees Fahrenheit.[2]

16.    It is well-known by the City of Phoenix that, when temperatures reach such extreme heat, surface temperatures of pavement in the City of Phoenix can reach as high as 180 degrees Fahrenheit.[3]

17.    Shortly before 2 p.m. on July 6, 2024, one of Michael Kenyon's roommates the downtown Phoenix home in which he lived (the "Home") called Phoenix Police to report a suspected non-violent theft.  Michael's roommate described the suspect to Phoenix Police dispatch (summarized by one of the officers involved as follows):

PHOENIX DISPATCH AND OFFICER JUSSEAUME RADIO COMMUNICATION:
1357 HOURS - DISPATCH: WHITE MALE, 5'5", TATS ON BACK, BLONDE HAIR AND BLUE EYES
1358 HOURS - DISPATCH: SAID HE FORCED ENTRY INTO HOME
1359 HOURS - DISPATCH: CAME THERE TO STEAL STUFF THINKS POSSIBLY GOING TO LEAVE SOON
1359 HOURS - OFFICER JUSSEAUME: JUST TO BE CLEAR STILL FORCED ENTRY
1401 HOURS - DISPATCH: STILL FORCED ENTRY AND TAKING LAPTOP
1401 HOURS - DISPATCH: ABOUT TO LEAVE
1402 HOURS - DISPATCH: SUBJECT POSSIBLY CARRYING PEPPER SPRAY
1402 HOURS - OFFICER JUSSEAUME: 23 (ARRIVED ON THE CALL)

18.    When all of this was unfolding Michael was at the Home.  He had spoken to his roommate whose laptop had been taken and was aware of the crime.

19.    Not expecting police to respond so quickly to take a report about a non-violent property crime, Michael left the home to walk to the Circle K around the corner to buy a drink.

20.    As Michael walked across a public parking lot towards the convenience store

---

[1] 2024 Climate Year in Review for Phoenix, Yuma, and El Centro
[2] Weather in Phoenix in July 2024 (Arizona) - Detailed Weather Forecast for a Month
[3] *See* Trying to cool off neighborhoods with a new kind of road surface | ASU News

he spoke on the phone.  Holding the phone in one hand, and a visible keychain in the other, it was obvious that he was not carrying a laptop or pepper spray.

21.     Wearing a tank top shirt, it was apparent he did not have tattoos.  And, standing 5'10" tall, he could not reasonably be mistaken for someone 5'5".

22.     When Phoenix Police officers Adelbert Caraig and Eric Jusseaume pulled up behind him in their Phoenix PD Tahoe, however, they called to Michael and instructed him to come back.

23.     Michael readily turned around in response to the officer's requests and willingly walked back to them.  He began to answer their first question to them.

24.     Within seconds of their initial contact with Michael, however, the officers grabbed both of his arms—despite the fact that Michael clearly did not fit the description of the person they were supposed to be looking for.

25.     Scared by the officers' aggressiveness, Michael sat on the bumper of a truck to show the officers he had no intention to flee and that they did not need to grab him and asked for clarification of what was happening.

26.     The officers responded by telling Michael that he was being detained.

27.     Less than 45 seconds on the bumper in hopes of demonstrating his compliance the officers put Michael on the ground.

28.     By this point two more officers—Officers Clarke and Salinas-Jerry—arrived. All four officers piled on top of Michael, pressing him against the scalding hot pavement.

29.     As Michael screamed out for help, the officers pressed hard—one officer at one point kneeling on his head, and pressing the side of his face into the asphalt as other officers put their weight on his torso.

30.     By the time the officers pulled Michael off the pavement four minutes had passed.  He had third-degree, full thickness burns on his arms, legs, chest, and face.  He was in so much pain he could not even stand, and had to be assisted into a police car.

31.    Eventually, Mr. Kenyon was able to walk to the police Tahoe, and sit in the back seat.  He waited there, handcuffed, in excruciating pain, and begging for help, until Phoenix Fire arrived and transported him to the Maricopa County Burn Center at Valleywise.

32.    Upon information and belief, Phoenix Fire administered Michael 200mg of Ketamine before he was brought to the hospital; as a result, when Michael arrived at the Burn Center's emergency room he was "altered on arrival and unable to provide further history."

33.    Upon  information and belief, Phoenix Police Officers followed Phoenix Fire to the hospital—and, with Michael incoherent, officers advised hospital staff (either directly or through Phoenix Fire) that Michael was "acting altered prior to" their contact with him.

34.    By the time Michael was admitted at the hospital, Pheonix PD officers knew Michael's name, date of birth, and other identifying information.  They also knew (as they did before they contacted him) that he was much taller than 5'5, he did not have tattoos on his back, and he was not carrying a stolen laptop or pepper spray.

35.    Despite being able to confirm that Michael was *not* the suspect they were looking for, officers caused Michael's phone to be taken from him, preventing him from calling his family, friends, or employer to let them know where he was or what happened.

36.    Then, incredibly and inexplicably—given that, again, officers were able to confirm that he was *not* the suspect for the non-violent theft offense they were investigating—Phoenix PD officers handcuffed him to the hospital bed:

1
2
3
4
5
6
7
8
9
10
11
12
13



14  37.    Michael would ultimately spend more than 30 days in the Maricopa County
15  Burn Center—during which he would go through a series of brutally painful procedures,
16  including skin grafts, to attempt to treat his injuries.  He has since spent time in physical
17  therapy attempting to regain mobility of his arms despite these burns.  And he continues to
18  carry the severe scarring and disfigurement of what these officers did to him.
19
20
21
22
23
24
25
26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26



**Phoenix PD's Deficient Training, Unconstitutional Practices,
and Violent Culture Caused Michael's Injuries**

38.     The incident with Michael Kenyon on July 6, 2024 was not the first time Phoenix police officers caused severe burns to individual by holding them on the scalding hot pavement during extreme summer heat.

39.     Further, the City of Phoenix's own actions demonstrate its knowledge of the dangers that hot pavement pose during extreme heat in summer months.

Phoenix Police Caused 2nd Degree Burns to a 17-year-old high school student.

40.     On August 20, 2019, Phoenix was in the midst of an historic heat wave.  That day, the mid-day temperature soared to approximately 113 degrees, breaking a 33-year-old record.[4]

41.     In light of the record heat, the National Weather Service issued an Excessive Heat Warning that day, cautioning individuals in Phoenix to avoid outdoor activities—and identifying most of the City as facing a level of heat that was "rare, dangerous, and deadly."[5]

42.     After completing her school day at South Pointe High School, a teenager named Roniah Trotter got into a verbal—and then physical altercation—with a classmate at South Phoenix bus stop.

43.     Like most adolescent fights, the altercation was short and mostly harmless: The girls quickly tired themselves out in the 113-degree heat and the fight ended without anyone being seriously physically injured.

44.     When it was over, the girls' peers milled around the bus stop, waiting in the heat for the next bus to arrive so they could board it and continue their trip home.

45.     When Phoenix Police officers arrived, the two girls were already separated and remained so as police completed witness interviews.

---

[4] *See* https://www.azcentral.com/story/news/local/phoenix-weather/2019/08/20/phoenix-forecast-city-could-break-heat-record-august-record-high-temperature/2032798001/
[5] *Id.*

46.     After concluding the interviews, an officer grabbed Roniah from behind. Roniah, who is approximately 5 feet, 4 inches tall and weighs about 130 pounds, was confused and agitated by the unexpected physical force and instinctually recoiled when the officer grabbed her.

47.     The officers then put Roniah onto the concrete, pinned her face-down, and held her there.

48.     As a result of the officers' conduct, Roniah suffered second-degree burns to her arms and filed a lawsuit against the City of Phoenix.

49.     That the officers grabbed Roniah, put her on the ground, and held her there until she suffered second-degree burns was never in dispute in that lawsuit—in which the City of Phoenix was named and served.

### Phoenix Police killed a man by holding him on the hot pavement

50.     On August 4, 2020, at approximately 10:30 a.m., when the temperature was approximately 100 degrees, Phoenix Police chased and tackled 28-year-old Ramon Lopez after he stole a drink from a convenience store.

51.     The officers pressed Mr. Lopez against the pavement and handcuffed him, ultimately leaving him there for approximately six minutes.[6]

52.     Eventually, police picked up Mr. Lopez's motionless body and moved it into a police vehicle.

53.      Mr. Lopez was later pronounced dead.

54.     Upon information and belief, Roniah Trotter and Ramon Lopez are not the only two people to be pressed against hot concrete by Phoenix Police officers and seriously injured.

---

[6]     https://www.azcentral.com/story/news/local/phoenix-breaking/2020/08/18/phoenix-police-release-video-ramon-lopez-custody-death/3396121001/

1

<u>Phoenix City Council's Actions to Protect Dogs from Hot Hiking Trails</u>

2      55.    Years before their injuries, in 2016, the Phoenix City Council implemented a

3  ban prohibiting pet owners from taking their dogs on a walk on any City hiking trail when

4  temperatures reach over 100 degrees Fahrenheit.

5      56.    Enacted to prevent burns to dog's feet caused by the notoriously high

6  temperature of the ground in the Phoenix summers, the City's regulation made it a class one

7  misdemeanor, punishable by a $2,500 fine and six months in jail, for people to bring their

8  dogs for hikes on days where the temperature exceeds 100 degrees.

9      57.    For years, the City's official website maintained a specific page dedicated to

10  *Pet Safety* warning pet owners that "[s]ummertime heat poses a significant threat the family

11  dog.  When walking or playing on hot asphalt during summer months, the dog's feet may

12  become burned."  Upon information and belief this page was deactivated after the injuries

13  to Ms. Trotter and the death of Mr. Lopez.

14      <u>The City of Phoenix's "Cool Pavement Program"</u>

15      58.    In 2020, the City of Phoenix implemented a "Cool Pavement Program" in the

16  City, a program in which the City selected portions of pavement in eight neighborhoods to

17  receive "cool pavement treatment" with a water-based asphalt treatment that is applied on

18  top of the existing asphalt pavement in an effort to cool down the surface temperature of

19  the pavement during summer months.[7]

20      59.    The City partnered with Arizona State University to conduct scientific tests

21  of the cool paved areas, studying how it performed and how it might be used to mitigate the

22  potential dangers associated with hot pavement.[8]

23      60.    Upon information and belief, despite being on actual notice of Roniah

24  Trotter's and Ramon Lopez's cases, and the serious injuries that could be caused to dogs

25

26  [7] *See* [Cool Pavement Program | City of Phoenix](Cool Pavement Program | City of Phoenix)
     [8] *Id.*

walking on hiking trails, neither the Phoenix City Council nor any other policymaker at the City of Phoenix made any effort to create a policy against pressing and holding human beings on concrete or asphalt on exceptionally hot days.

61.    Upon information and belief, despite being on actual notice of Roniah Trotter's and Ramon Lopez's cases, as well as the serious injuries that could be caused to dogs walking on hiking trails, neither the Phoenix City Council nor any other policymaker at the City of Phoenix made any effort to create a policy regarding pressing human beings against concrete or asphalt on exceptionally hot days.

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983—Excessive Force in Violation of the Fourth Amendment
### (Against Individual Officer Defendants)

62.    Plaintiff incorporates by reference all allegations asserted in the paragraphs above as though they were fully set forth herein.

63.    42 U.S.C. § 1983 provides, in relevant part, as follows:

> Every person, who under the color of any statute, ordinance, regulation, custom or usage of any state or territory of the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress. . .

64.    Michael Kenyon is a citizen of the United States, and Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume are "person[s]" for the purposes of 42 U.S.C. § 1983.

65.    Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume were, at all times relevant hereto, acting under the color of law, in their capacities as a City of Phoenix police officers.

66.    At the time of the above-mentioned, complained-of events, the Fourth Amendment to the United States Constitution clearly established Michael Kenyon's right to be secure in his person from unreasonable seizure through excessive force.

67.    Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume violated these rights when they held Michael down, despite the fact that he committed no crime and did not resist officers efforts to question him, on hot concrete that caused him to sustain third-degree burns on large portions of his body.

68.    Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume engaged in the above-described conduct willfully, maliciously, in bad faith, and in reckless disregard of Michael's federally protected constitutional rights.

69.    The acts and omissions of Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume as described herein intentionally deprived Michael of his constitutional and statutory rights and caused him other damages.

70.    Furthermore, Defendants Caraig and Jusseaume have a history of engaging in excessive force, as they were involved in a serious use-of-force incident just two months prior to the incident involving Michael, resulting in significant injuries to a citizen having a mental health crisis. Upon information and belief, review of the body-worn camera footage demonstrated use of excessive force to the point that all charges against the citizen were dropped.

71.    Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume are not entitled to qualified immunity for the complained-of unconstitutional and illegal conduct because Michael's had a clearly established constitutional right to be free from excessive force, and any reasonable officer in the defendants' position would know that, at 2 p.m. on a 113-degree day, the parking lot asphalt would be extremely hot and pressing a human being against it for over four minutes would likely cause serious bodily injury or death.

72.    As a proximate result of Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume Bryce's unlawful conduct, Michael suffered severe permanent injuries, pain and suffering, and other damages and losses as described herein, entitling him to damages in amounts to be determined at trial.

1

73.     Michael is further entitled to attorneys' fees and costs under 42 U.S.C. § 1988,

2     pre-judgment interest and costs allowable by federal law.

3

74.     In addition to compensatory, economic, consequential, and special damages,

4     Michael is entitled to punitive damages against Defendants Clarke, Salinas-Jerry, Caraig,

5     and Jusseume under 42 U.S.C. § 1983, in that the actions of these Defendants were taken

6     maliciously, willfully, or with reckless or wanton disregard of his constitutional rights.

7                          **SECOND CLAIM FOR RELIEF**
                    **Municipal Liability Under *Monell***
8                      **(Against the City of Phoenix Only)**

9

75.     Plaintiff incorporates by reference all allegations asserted in the paragraphs

10     above as though they were fully set forth herein.

11

76.     This claim is brought pursuant to 42 U.S.C. § 1983.

12

77.     Defendant City of Phoenix maintains an armed police force, the Phoenix

13     Police Department, with the power to arrest citizens.

14

78.     Under a *Monell* theory of liability, a municipality may be held liable for an

15     officer's actions when a plaintiff establishes that the officer violated their constitutional

16     right, and where the violation resulted from either official policy (or lack thereof), unofficial

17     departmental custom, or because the municipality was deliberately indifferent in failing to

18     train or supervise the officer. *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S.

19     658, 694 (1978); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

20     **A.     Lack of Official Policy**

21

79.     Defendant City of Phoenix is liable under *Monell* due to Phoenix Police

22     Department's decision- and policymaking with respect to the holding of citizens against

23     dangerously hot pavement during extreme heat conditions, was so inadequate in view of the

24     potential dangers associated with this practice as to show Phoenix Police Department's

25     deliberate indifference to the wellbeing of people subjected to the dangers of these actions.

26

80.    Upon information and belief, the City of Phoenix lacked an official policy concerning the holding of citizens against scalding hot pavement during extreme heat conditions, despite having knowledge that doing so was substantially likely to cause severe injury and that officers were nearly certain to encounter such situations on a routine basis in the City of Phoenix.

81.    Indeed, evidencing the City's lack of an official policy concerning the holding of citizens against dangerously hot pavement during extreme heat conditions, the City of Phoenix has ratified the unconstitutional conduct of Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume by finding that they acted within City policy at the time when they forcibly held Michael Kenyon to the hot pavement during a 115-degree day for approximately four minutes, even though he had not committed any crime.[9]

82.    Recognizing the need for an official policy to address this known, recurring situation, the City of Phoenix has since implemented a policy that states: "Employees will be reasonably attentive to environmental conditions, extreme temperatures, surface heat, etc. when placing a person the ground, against vehicles, or other surfaces. When safe and feasible, employees will promptly move subjects to temperature safe locations during detention, arrest, or while in custody."[10]

83.    A municipality may be liable under a lack of official policy theory when there is an underlying constitutional violation, the City's policy, or lack thereof, amounts to deliberate indifference to constitutional rights, and the policy, or lack thereof, caused the violation, in the sense that the City could have prevented the violation with an appropriate policy.

84.    The Defendant City of Phoenix's lack of an official policy concerning the pressing and holding of citizens against dangerously hot pavement during known, extreme

---

[9] Phoenix PD faces new lawsuit from burn incident | FOX 10 Phoenix
[10] *Id.*

heat conditions, despite knowing that such situations were substantially likely to occur on a regular basis in the City of Phoenix, amounts to deliberate indifference to constitutional rights.

85.    The Defendant City of Phoenix's lack of an official policy concerning the pressing and holding of citizens against dangerously hot pavement during known, extreme heat conditions, despite knowing that such situations were substantially likely to occur on a regular basis in the City of Phoenix, caused the violation of Michael Kenyon's constitutional rights.

86.    Defendant City of Phoenix could have prevented the violation of Michael Kenyon's constitutional rights had it adopted an appropriate policy with respect to the holding of citizens against dangerously hot pavement during known, extreme heat conditions.

87.    Here, Defendants Caraig, Jusseaume, Clarke, and Salinas-Jerry utilized this practice without the need to take Plaintiff to the ground and while being aware of the dangers of the dangerously hot pavement during extreme heat conditions, in part, because there was no official policy governing their conduct.

88.    The omission of a prohibition against utilizing this practice would lead a reasonable officer to believe that he or she can hold citizens against dangerously hot pavement under extreme heat conditions, regardless of the circumstances and without regard to the safety of citizens of the City of Phoenix, like Michael Kenyon.

89.    Upon information and belief, the lack of a Phoenix Police Department policy concerning the pressing and holding of citizens against dangerously hot pavement during known, extreme heat conditions has contributed to numerous instances of excessive force, causing unnecessary death, injury, and suffering.

90.    Defendants Caraig, Jusseaume, Clarke, Salinas-Jerry, and the City of Phoenix are custodians of records reflecting such uses of force and are aware of this pattern and

1    practice.

2    91.    As the circumstances of this case indicate, the lack of official policy invited

3    violations of civil rights law, which requires that force used not be grossly disproportionate

4    to the threat posed. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (holding that officers'

5    authority in employing physical force depends on the severity of the crime at issue, whether

6    the suspect poses an immediate threat to the safety of the officers or others, and whether

7    they are actively resisting arrest or attempting to evade arrest by flight).

8    **B.    Failure to Train/Discipline**

9    92.    "Municipal liability for failure to train may be proper where it can be shown

10   that policymakers were aware of, and acquiesced in, a pattern of constitutional violations

11   involving the exercise of police discretion." *City of Canton, Ohio*, 489 U.S. at 397.

12   93.    A municipality may also be liable for a failure to train under *Canton v. Harris*

13   and its progeny if the constitutional violation is a "highly predictable consequence" of the

14   city's complete failure to train officers how to "handle recurring situations." *Bd. of Cnty.*

15   *Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997).

16   94.    The City of Phoenix is well known to be one of the hottest cities in the United

17   States, routinely experiencing extreme heat, with temperatures often exceeding 110 degrees

18   Fahrenheit during summer months.

19   95.    It was well-known by the City of Phoenix prior to the incident involving

20   Michael that surface temperatures of pavement in the City of Phoenix can reach as high as

21   180 degrees Fahrenheit during summer months.[11]

22   96.    As a result, in 2020, the City of Phoenix implemented a "Cool Pavement

23   Program" in the City, a program in which the City treated portions of pavement in eight

24   neighborhoods in an effort to cool down the surface temperature of the pavement during

25

26   _____
     [11] *See* Trying to cool off neighborhoods with a new kind of road surface | ASU News;
     Phoenix is tying records for highest low temperatures.  Here's why (azcentral).

summer months.[12] The City partnered with Arizona State University to conduct scientific tests of the cool paved areas, studying how it performed and how it might be used to mitigate the potential dangers associated with hot pavement.[13]

97.    The City has also recognized the dangers of hot pavement and affirmatively addressed these danger as it relates to dogs, by implementing a ban prohibiting pet owners from taking their dogs on a walk on any City hiking trail when temperatures reach over 100 degrees Fahrenheit.

98.    Yet, upon information and belief, at the time of the incident, the Phoenix Police Department provided no training regarding the foreseeable and recurring situation of citizens being brought to the ground and held on the pavement during police encounters in summer months and the potential for citizens to sustain severe burn injuries when held and/or pressed onto hot pavement.

99.    This lack of training is particularly disturbing, given that Phoenix PD has caused severe burns to at least two other citizens, including one death, by pressing them against, holding them on, and/or leaving them restrained on pavement during summer months prior to the incident involving Michael.

100.    Under *Canton*, liability may attach to a municipality if "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio*, 489 U.S. at 390.

101.    The above-mentioned well-known and recurring situation shows "the need for more or different training," as the *Canton* Court put it.

---

[12] *See* Cool Pavement Program | City of Phoenix
[13] *Id.*

1

**C.     Widespread Unconstitutional Custom or Usage**

2      102.    In addition to establishing *Monell* liability through a failure to train theory, a

3   plaintiff may support a Monell claim by alleging a widespread unconstitutional custom or

4   usage. *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011).

5      103.    The Ninth Circuit has recognized that a "municipality may be liable for its

6   custom 'irrespective of whether official policy-makers had actual knowledge of the practice

7   at issue.'" *Id.* (*quoting Navarro v. Block*, 72 F.3d 712, 714–15 (9th Cir.1995)).

8      104.    In the years prior to Plaintiff's injuries, Phoenix police officers were involved

9   in multiple use-of-force incidents that resulted in burns from dangerously hot pavement

10  which demonstrate that the Phoenix Police Department's training regarding this practice

11  and the use-of-force in general is grossly inadequate:

12          a.  On August 20, 2019, officers caused 2nd Degree Burns to a 17-year-old high

13              school student when they grabbed her, put her on the pavement on a 113-

14              degree day, and held her there face-down.

15          b.  On August 4, 2020, officers killed a man by holding him on hot pavement in

16              100-degree temperatures.

17     105.    Upon information and belief, there are numerous additional instances of

18  Phoenix Police officers engaging in excessive force involving pressing and/or holding

19  citizens onto dangerously hot pavement that are not public record or accessible to the public

20  outside of litigation.

21     106.    This pattern and practice of excessive force has been pervasive within the

22  Phoenix Police Department in recent years.

23     107.    Pursuant to *Canton*, "a pattern of constitutional violations could put the

24  municipality on notice that its officers confront the particular situation on a regular basis,

25  and that they often react in a manner contrary to constitutional requirements" and the

26  municipality's failure to address the pattern of violations is "tacit authorization" of the

unconstitutional practices. *City of Canton, Ohio*, 489 U.S. at 397.

108.    Additionally, under *Canton*, a municipality may be liable for a "single violation of federal rights" when it is accompanied by a showing that the municipality has "failed to train its employees to handle recurring situations presenting an obvious potential for such a violation...." *Bd. of Cnty. Comm'rs*, 520 U.S. at 409.

109.    The Phoenix Police Department's toleration of and failure to discipline officers who engage in excessive force, is evidence that Plaintiff's injuries are traceable to the City's custom of permitting excessive force, and it is evidence that they have acted with deliberate indifference in failing to supervise their officers. *See, e.g., Bd. of Cnty. Comm'rs*, 520 U.S. at 404 (stating that "an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law").

110.    In this case, Phoenix Police Department's practice of ignoring the dangers of hot pavement by placing and holding citizens on it and disregard for clearly-established Ninth Circuit law resulted in the unnecessary injuries of Plaintiff.

111.    The City has failed to act to address Phoenix police officers' pattern and practice of holding and pressing citizens on dangerously hot pavement and, more generally, to interrupt the department's pattern and practice of engaging in excessive force.

112.    The City failed to properly supervise and discipline officers, despite being aware that there is a pattern, practice, and culture within the Phoenix Police Department using the type of force described above.

113.    Individually and collectively, the aforementioned facts, lawsuits, incidents, and staffing and training decisions support the conclusion that the Phoenix Police Department has a policy, practice, or custom of violating the rights of people through the use of excessive force and, in particular, pressing and holding individuals against

1    dangerously hot pavement during known, extreme heat conditions.

2         114.   As a proximate result of Defendants' policy, practice, or custom, Plaintiff

3    suffered severe permanent injuries, pain and suffering, and other damages and losses as

4    described herein, entitling him to damages in amounts to be determined at trial.

5         115.   Plaintiff is further entitled to attorneys' fees and costs under 42 U.S.C. § 1988,

6    pre-judgment interest and costs allowable by federal law.

7                              **THIRD CLAIM FOR RELIEF**
                             **Gross Negligence—Vicarious Liability**
8                          **(Against Defendant City of Phoenix Only)**

9         116.   Plaintiff hereby incorporates all allegations contained in the foregoing

10   paragraphs as if they were full set forth herein.

11        117.   As set forth herein, Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume

12   evidenced a reckless disregard for Michael's rights and safety by, among other things,

13   putting him on the ground and pressing him against dangerously hot asphalt until he

14   sustained third-degree burns over large portions of his body.

15        118.   As a direct and proximate cause of these officers' gross negligence Michael

16   was injured and suffered damages in an amount to be proven at trial.

17        119.   As set forth herein, these officers were acting within the course and scope of

18   their employment with the City of Phoenix:  they were City of Phoenix employees,

19   performing acts they were authorized to perform; they were on-duty, working in their

20   regular job capacities as police officers; and their actions were motivated, at least in part,

21   by a purpose to serve the City of Phoenix.

22        120.   Because these Officers were acting within the course and scope of their

23   employment for the City of Phoenix, Defendant City of Phoenix is vicariously liable for the

24   damages caused by these employees' grossly negligent conduct.

25

26

### FOURTH CLAIM FOR RELIEF
**Intentional Infliction of Emotional Distress – Vicarious Liability**
**(Against Defendant City of Phoenix only)**

121.    Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if they were fully set forth herein.

122.    The above-described actions of Defendants Clarke, Salinas-Jerry, Caraig, and Jusseume – pressing and holding Michael against hot concrete until the skin melted from his body and he believed he was going to die, surveilling him in the hospital, and handcuffing him to a hospital bed – were extreme and outrageous.

123.    An average member of the community would regard the conduct referenced in the foregoing paragraph as atrocious, intolerable in a civilized community, and beyond all possible bounds of human decency.

124.    The above-described conduct of these officers was intentional insofar as they intended to cause Michael emotional distress.

125.    The above-described conduct of these Officers was reckless because they were aware of and consciously disregarded the near certainty that it would cause Michael emotional distress.

126.    The above-described conduct of these Officers caused Michael to suffer severe emotional distress, including without limitation severe anxiety, depression, night terrors, flashbacks, guilt, shame, and social isolation.

127.    As a direct and proximate result of the actions of these Officers, Michael was injured and suffered damages in an amount to be proven at trial.

128.    As set forth herein, these Officers were acting within the course and scope of their employment with the City of Phoenix:  they were City of Phoenix employees, performing acts they were authorized to perform; they were on-duty, working in their regular job capacities as police officers; and their actions were motivated, at least in part, by a purpose to serve the City of Phoenix.

129.   Because these Officers were acting within the course and scope of their employment for the City of Phoenix, Defendant City of Phoenix is vicariously liable for the damages caused by these employees' tortious conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael Kenyon hereby requests that the Court enter judgment against Defendants and issue an award in Plaintiff's favor as follows:

    a.  For damages in an amount to compensate Mr. Kenyon fairly and fully for the numerous violations of his Constitutional Rights;

    b.  For general, consequential, special, and compensatory damages, including but not limited to Mr. Kenyon's past and future medical expenses, past and future lost wages and lost earning capacity, pain and suffering, mental anguish, emotional suffering, permanent scarring and disfigurement, and loss of enjoyment of life, arising both out the violations of both his constitutional rights and the officers' tortious conduct;

    c.  For nominal damages as provided for by law;

    d.  For punitive damages as provided for by law;

    e.  For prejudgment interest on all liquidated sums;

    f.  For attorneys' fees under 42 U.S.C. §§ 1983 and 1988, and as provided for by Arizona law;

    g.  For Mr. Kenyon's costs and other expenses incurred in this action; and

    h.  Such other and further relief as the Court deems just.

## JURY DEMAND

Plaintiff hereby demands a jury trial for all claims so triable.

1       DATED this 6th day of August, 2025.

2                                              THE PEOPLE'S LAW FIRM, PLC
                                               645 North 4th Avenue, Suite A
3                                              Phoenix, AZ  85003

4

5                                              By: /s/ Stephen D. Benedetto
                                                   Stephen Benedetto
6
                                               *Attorneys for Plaintiff Michael Kenyon*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26